UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NUCLIMATE AIR QUALITY SYSTEMS,
INC., AND JAMES MILLER,

                                        Plaintiffs,

        -v.-                                              5:08-CV-0317
                                                         (NPM/ATB)

AIRTEX MANUFACTURING
PARTNERSHIP as successor in interest
to M&I Heat Transfer Products, Ltd as of
6/10/2010,

                                        Defendant.

APPEARANCES:                            OF COUNSEL:

HARRIS BEACH PLLC                       NEAL LOUIS SLIFKIN, ESQ.
Attorneys for Plaintiffs                LAURA W. SMALLEY, ESQ.
99 Garnsey Road
Pittsford, NY 14534

HARRIS BEACH PLLC                       TED H. WILLIAMS, ESQ.
Attorneys for Plaintiffs
One Park Place
4th Floor
300 South State Street
Syracuse, NY 13202

MEREK, BLACKMON & VOORHEES,
P.C.                                    JAMES J. MEREK, ESQ.
Attorneys for Defendant
673 South Washington Street
Alexandria, VA 22314

MENTER, RUDIN & TRIVELPIECE,          CELIA E. MOORE, ESQ.
 P.C.
Attorneys for Defendant
308 Maltbie Street, Suite 200
Syracuse, NY 13204-1498


Neal P. McCurn, Senior District Judge


### *MEMORANDUM, DECISION AND ORDER*

### *I.  Introduction*

Presently before the court in this patent infringement action are separate motions for partial summary judgment by plaintiffs and counter defendants, NuClimate Air Quality Systems, Inc. ("NuClimate") and James Miller ("Miller") (collectively, "Plaintiffs"), and by defendant and counter plaintiff Airtex Manufacturing Partnership ("Airtex").[1]  Opposition and reply papers have been submitted regarding each motion.  Also pending is a motion by Airtex for leave to file a supplemental memorandum in further opposition to Plaintiffs' motion for summary judgment.  Plaintiffs oppose.  Decision on all motions is rendered on the papers submitted, without oral argument.

This action involves U.S. Patent No. 6,623,353 ("the '353 patent"), entitled "Venturi Type Air Distribution System."  See Decl. of Muammer Yazici, October 23, 2008, Dkt. No. 34-2 ("Yazici Decl."), Tab A.  Airtex, current owner of the '353 patent, contends that two air handling systems owned by NuClimate – the Q-4 air terminal and the Q-360 air terminal – infringe the '353 patent.  This court

---

[1]  Pursuant to Rule 25(c) of the Federal Rules of Civil Procedure, Airtex Manufacturing Partnership ("Airtex") is substituted as the defendant and counter plaintiff in this action, as successor in interest to M&I Heat Transfer Products, Ltd. effective 6/10/2010.

2

previously decided a motion for a preliminary injunction by M & I Heat Transfer Products, Ltd. ("M & I"), former owner of the '353 patent, wherein it enjoined Plaintiffs from "the further manufacture, use, sale, and/or offer for sale of" the Q-4 model but denied the motion regarding the Q-360 model.  NuClimate Air Quality Sys., Inc. v. M & I Heat Transfer Prods., Ltd., No. 5:08-CV-0317, 2008 WL 2917589, at *22 (N.D.N.Y. July 24, 2008).  Familiarity with the background of this action as set forth in this court's Memorandum, Decision and Order regarding the motion for preliminary injunction, is presumed.  See id., at *1-5.

Airtex now moves for partial summary judgment, seeking an order that the Q-4 air terminal infringes several claims of the '353 patent, that the '353 patent is valid and enforceable, and that Miller is not an inventor of the '353 patent. Plaintiffs also move for partial summary judgment, seeking an order that their Q-360 air terminal does not infringe the '353 patent.  Each motion is opposed and each movant has replied.  Airtex further moves to file a supplemental memorandum or sur-reply in opposition to Plaintiffs' motion for partial summary judgment, which Plaintiffs oppose.  For the following reasons, the court grants both motions for partial summary judgment, and denies Airtex's motion for leave to file a supplemental memorandum.  Because Airtex sought damages on its counter claim but has limited its motion for summary judgment to issues of liability, the issue of damages remains to be resolved at trial.

## II.  Discussion

### A.  Summary Judgment Standard

A motion for summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  See also Beyer v. County of Nassau,

524 F.3d 160, 163 (2d Cir. 2008).  "In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial." Major League Baseball Props., Inc. v. Salvino, Inc.,  542 F.3d 290, 309 (2d Cir. 2008) (internal quotation and citation omitted).

The movant has the burden to show that no genuine factual dispute exists. See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598 (1970)).  Moreover, when the court is deciding a motion for summary judgment, it must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor.  See id.

When deciding whether a material issue of fact is in dispute, the court is cognizant that a fact is "material" if "it might affect the outcome of the suit under governing law." White v. Haider-Shah, No. 9:05-CV-193, 2008 WL 2788896, at *4 -5  (N.D.N.Y. Jul. 17, 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986)).  Also, "[a] material fact is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id.

It should also be noted that, pursuant to Local Rule 7.1(a)(3), the court deems admitted any statement of material fact that is not specifically controverted by the opposing party.  See N.D.N.Y. R. 7.1(a)(3).

### *B.  Airtex's Motion for Partial Summary Judgment*

Airtex seeks an order that the Q-4 literally infringes several claims of the 353 patent, that the '353 patent is valid and enforceable, and that Miller is not an inventor of the '353 patent.  In support of its argument that the Q-4 literally infringes the '353 patent, Airtex relies almost exclusively on the declaration of Muammer Yazici, President of M & I, the entity that owned the '353 patent at the

time this action was commenced.  See Yazici Decl., Dkt. No. 34-2.  Regarding Plaintiffs' validity challenges and claim of inventorship, Airtex relies on this court's previous decision granting M & I's motion for a preliminary injunction as to the Q-4, to argue that Plaintiffs have failed to meet their burden of proof.

In opposition, Plaintiffs argue that Airtex cannot prevail on its motion because certain of the claims of the '353 patent contain language which is ambiguous – specifically, the terms "venturi effect" and "transverse, vertical cross section."  Moreover, Plaintiffs argue, additional discovery is needed for the court to fully evaluate their claims of invalidity and inventorship and therefore, Airtex's motion is premature in this regard and should be denied.

### 1. Infringement

There are three forms of patent infringement defined by statute: direct, induced and contributory.  See 35 U.S.C. §§ 271(a)-(c).  Direct infringement, which includes either literal or equivalent infringement, is defined as the making, using, selling or offering for sale the patented invention.  See § 271(a); Cross Med. Prod., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1310 (Fed. Cir. 2005).  Here, Airtex seeks an order that the Q-4 literally infringes claims 1, 2, 5, 8, 10, 15 and 17 of the '353 patent.  Literal infringement occurs when "each and every limitation set forth in a claim appear[s] in an accused product."  Cross Med. Prod., Inc., 424 F.3d at 1310.

"A determination of patent infringement requires a two-step analysis: first, the meaning of the claim language is construed, then the facts are applied to determine if the accused device falls within the scope of the claims as interpreted."  MBO Labs., Inc. v. Becton, Dickinson & Co., 474 F.3d 1323, 1329 (Fed. Cir. 2007) (citing Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384 (1996)).  Accordingly,

construction of the meaning of claim language is a question of law for the court to decide.  See NTP, Inc. v. Research In Motion, Ltd., 418 F.3d 1282, 1305 n.8 (Fed. Cir. 2005) (citing Markman, 52 F.3d at 978-79).

Here, Plaintiffs do not dispute that the Q-4 infringes claims 1, 2, 5, 10 and 17 of the '353 patent.  Accordingly, the court's claim construction is limited to claims 8 and 15 of the '353 patent, which contain the alleged ambiguous language.

Airtex's Statement of Material Facts[2] consists almost entirely of a reading of claims 1, 2, 5, 8, 10, 15 and 17 of the '353 patent, followed by descriptions of the Q-4 which mirror the claim language.  In support of their Statement of Material Facts ("SOMF"), Airtex relies almost exclusively on the declaration of M & I's president, Muammer Yacizi ("Yacizi").  In support of his assertions, Yacizi relies on plaintiff NuClimate's literature regarding the Q-4 as well as Plaintiffs' papers in opposition to the former motion for preliminary injunction, including a declaration of Plaintiffs' purported expert, Michael I Tatkow, P.E.  See Yacizi Decl. Exs. C-G, Dkt. No. 34.  Significantly, Plaintiffs admit each of Airtex's material facts, except where they argue that Airtex states a legal conclusion, see Pls.' Response to Def.'s SOMF ¶¶ 3-5, 8, 18, 22, 31, 33, 47, 49 and 51, Dkt. No. 43, or where the statement of fact includes the phrase "transverse, vertical cross-section" or "venturi effect," both of which Plaintiffs argue are ambiguous, see id., ¶¶12, 16, 17, 27 and 30.  Accordingly, because Plaintiffs admit that the elements of claims 1, 2, 5, 10 and 17 of the '353 patent are present in the Q-4, the court concludes that the Q-4 literally infringes said claims.

The court is therefore left to construe the meaning of the challenged claim

---

[2] See N.D.N.Y. R 7.1(a)(3).

6

language, which appears in independent claims 8 and 15.[3]  When interpreting claims, courts must view them "in the context of 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" <u>MBO Labs., Inc.</u>, 474 F.3d at 1329 (quoting <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (<u>en banc</u>)).  The most relevant of the intrinsic evidence is the patent's specification, followed by the prosecution history.  <u>See</u> <u>id.</u>  Extrinsic evidence, such as "testimony, dictionaries, learned treatises, or other material not part of the public record associated with the patent[,] may be helpful but is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" <u>Id.</u> (quoting <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  Ultimately, though, words used in patent claims are to be interpreted to "have the meaning and scope with which they are used in the specification and the prosecution history." <u>Id.</u> (citing <u>Multiform Desiccants, Inc. v. Medzam, Ltd.</u>, 133 F.3d 1473, 1478 (Fed. Cir. 1998).

Claim 8 of the '353 patent discloses:

An air handling apparatus for a building having an enclosed space, said apparatus comprising:

four induction units adapted for mounting in a ceiling of the enclosed space and forming four sides of an induction unit assembly which is substantially rectangular or square in plan view, each induction unit including an air plenum section with a primary air inlet, an air mixing section connected to said air plenum

---

[3] Notably, Plaintiffs admit Airtex's statement of material fact regarding independent claim 1, which also includes the phrase, "venturi effect" to describe how the Q4 operates, to wit, that "[d]uring use of the Q4, the return air is drawn by venturi effect ... ."  Def.'s SOMF ¶ 46; Pls.' Response to Defs.' SOMF ¶ 46.

section and forming an air mixing chamber which in *transverse, vertical cross-section* is elongate, and a series of air nozzles mounted on one side of said air mixing section and extending into said air mixing chamber, each air mixing section having an air outlet in an end thereof spaced from said air plenum section and a side air inlet for permitting return air to flow through a side of said air mixing section in the region of said nozzles;

and supporting members for mounting said induction unit assembly at or near said ceiling so that each air mixing section as seen in *transverse, vertical cross-section* extends at an angle of about 90 degrees to said ceiling during use of said apparatus;

wherein, during use of said apparatus, said return air is drawn by *venturi effect* created by a flow of primary air from said nozzles into each air mixing chamber and said induction units are capable of providing air flows comprising a mixture of said primary air and return air at said air outlets.

Ex. A to Yacizi Decl, Dkt No. 34-3 (emphasis added).  Claim 15 of the '353 patent discloses:

An air handling system for a building having a ceiling and an enclosed space below said ceiling, said system comprising:

four induction units adapted for mounting adjacent said ceiling and forming four sides of an induction unit assembly which is substantially rectangular in plan view, each of said units having a primary air intake section and an air mixing section that, during use of said system and when viewed in *transverse, vertical cross-section* extends downwardly at an angle of approximately 90 degrees to said ceiling to an air outlet formed at a lower end of the air mixing section, each air mixing section also having a side air inlet for permitting return air to

8

flow through a side thereof into an air mixing chamber of
the induction unit; and

supporting members for mounting the rectangular
induction unit assembly so that said assembly is located
adjacent said ceiling during use of the system in the
building, wherein during use of the system, said return
air is drawn by a *venturi effect* into each air mixing
chamber and said induction units are capable of
delivering a mixture of primary air, taken from the
primary air intake sections, and return air through the air
outlets to said enclosed space.

Id. (emphasis added).

Plaintiffs argue that there is an "actual dispute regarding the proper scope of
the claim language," citing in support thereof deposition testimony of plaintiff
Miller that he does not know what a "transverse vertical cross-section" or a
"Venturi effect" is. See Pls.' Response to Def.'s SOMF ¶¶ 12, 16, 17, 27 and 30
citing Dep. of James Miller, Oct. 28, 2008, at 137, 142, Dkt. No. 42-2. In
addition, Plaintiffs cite Webster's Dictionary definitions of the terms venturi,
transverse, and cross-section. See Decl. of Neal L. Slifkin, Dec. 15, 2008, Exs. 2-
4, Dkt. No. 42. Plaintiffs also argue, without supporting authority, that because
"transverse" and "cross-section" have the same dictionary meaning, it is clear one
of the terms cannot have its ordinary meaning.

Nonetheless, the court's reading of the specification, which is the most
relevant of the intrinsic evidence and must be relied upon before less significant
extrinsic evidence such as dictionary definitions or the deposition testimony of a
party, reveals that the terms "transverse vertical cross-section" and "Venturi
effect" in claims 8 and 15 are not ambiguous and are as Airtex argues, readily
understood. See Ex. B to Yacizi Decl. Further, the terms are satisfied by the Q-4.

9

Consequently, the Q-4 infringes claims 1, 2, 5, 8, 10, 15 and 17 of the '353 patent.

Plaintiffs may still successfully avoid summary judgment if there is a question of fact regarding any of their challenges to validity or inventorship of the '353 patent.

### 2. Challenges to Validity and Inventorship

Airtex argues that Plaintiffs cannot prevail on their inventorship claim or validity challenge because this court previously found on the preliminary injunction motion that they failed to raise a substantial question as to these issues, which is a lower burden than would be required at trial.  Plaintiffs counter that this court found issues of fact regarding conception and reduction to practice of the '353 patent, thus preventing summary judgment.  Plaintiffs further argue that Airtex's motion is premature, as discovery was not complete at the time the motion was filed.  Airtex responds that the evidence upon which this court relied in finding a question of fact at the preliminary injunction stage was defective and that Plaintiffs failed to file a motion under Rule 56(f) of the Federal Rules of Civil Procedure seeking further discovery.

Pursuant to Rule 56(d) (formerly Rule 56(f)), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).  Here, Plaintiffs have not filed an affidavit or declaration, and have not provided any specifics as to: (1) the discovery they would seek, (2) how that discovery is reasonably expected to create a genuine issue of fact, (3) what efforts they have made to obtain the discovery, and (4) why they were unsuccessful in those efforts.  See Graziani v. County of Erie, No. 03-CV-437S(F), 2010 WL 3635711, at *1 (W.D.N.Y. Sept. 14, 2010)

10

citing Hudson River Sloop Clearwater, Inc. v. Dept. of Navy, 891 F.2d 414, 422 (2d Cir.1989)). "[A] party's failure to seek discovery under Rule 56[d] before responding to a summary judgment motion is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." New York State Teamsters Conference Pension and Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 648 (2d Cir. 2005) (citation and quotation omitted). Accordingly, Plaintiffs' argument that Airtex's motion is premature is without merit and will not be considered further.

Also, it is important to note that Plaintiffs do not submit any additional evidence in opposition to Airtex's motion for summary judgment. To be sure, Plaintiffs assert additional material facts, which Airtex fails to dispute, and are therefore deemed admitted where supported by the record. See Pls.' Statement of Additional Material Facts, Dkt. No. 44. See also N.D.N.Y. R 7.1(a)(3); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001). Plaintiffs' additional facts, however, are based entirely on evidence which was considered by the court on the motion for preliminary injunction.

At this point, a brief discussion of this court's findings and conclusions at the preliminary injunction stage is warranted. In opposition to the motion for preliminary injunction, Plaintiffs did not contest a likelihood of success on the merits of the infringement claim regarding the Q-4. Plaintiffs did, however, attack the validity of the '353 patent by arguing that (1) the subject matter is obvious, (2) the named inventors should be amended to include Miller, or (3) a question of priority of invention is raised.

### a.  Obviousness

A patent is presumed to be valid, and the "burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."

11

35 U.S.C. § 282.  At trial, "the party seeking to show invalidity must prove facts supporting invalidity by clear and convincing evidence." Abbott Labs. v. Baxter Pharm. Prods., Inc., 471 F.3d 1363, 1367 (Fed. Cir. 2006).

Obviousness is a legal issue based on underlying questions of fact.  See Western Union Co. v. MoneyGram Payment Sys., — F.3d —, 2010 WL 4942124, at *6 (Fed. Cir. Dec. 7, 2010) (citing In re Kubin, 561 F.3d 1351, 1355 (Fed. Cir. 2009)).  The underlying factual questions are as follows: "(1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others." Id. (citing Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S.Ct. 684 (1966)).

On the motion for a preliminary injunction, the court concluded that Plaintiffs failed to show a likelihood of success on the merits of their obviousness claim because the prior art at issue was considered by the United States Patent and Trademark Office ("PTO") during prosecution of the '353 application and because plaintiff Miller admitted the challenged subject matter was not in the prior art. Plaintiffs have not submitted further evidence as to their claim of obviousness and therefore have not met their burden of proof regarding same.  Consequently, Airtex is entitled to an order that the subject matter of the '353 patent is not obvious.

### b.  Correction of Inventorship

The named inventors on an issued patent are presumed to be correct, and a party alleging nonjoinder of inventors must prove facts supporting same by clear and convincing evidence.  See Univ. of Pittsburgh v. Hedrick, 573 F.3d 1290, 1297 (Fed. Cir. 2009).

An inventor who was erroneously omitted from a patent (a nonjoined inventor) may seek correction in federal court pursuant to 35 U.S.C. § 256.  The statute provides a procedure for correction of nonjoined inventors on an issued patent as follows: "Whenever through error ... an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the [PTO] may, on application of all the parties and assignees, with proof of facts and such other requirements as may be imposed, issue a certificate correcting such error." 35 U.S.C. § 256.  Because, in a proceeding under § 256, named inventors on an issued patent are presumed to be correct, a claimed inventor, such as Miller here, bears a heavy burden of proving his case by clear and convincing evidence. See Finkelstein v. Mardkha, 495 F.Supp.2d 329, 337 (S.D.N.Y. 2007) (citing Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980 (Fed. Cir. 1997)).

A district court may order correction of named inventors "on notice and hearing of all parties concerned and the [PTO] shall issue a certificate accordingly." 35 U.S.C. § 256.  Therefore, the only procedural requirement imposed on a district court in deciding whether to order correction of named inventors are "notice and an opportunity for all parties to be heard." Stark v. Advanced Magnetics, Inc., 119 F.3d 1551, 1553 (Fed. Cir. 1997).  The substantive standards imposed by § 256 require an inquiry only as to the intent of the nonjoined inventor, here, Miller.  See Stark, 119 F.3d at 1552.  The Court of Appeals for the Federal Circuit has interpreted § 256, "constru[ing] the term 'error' to extend to mistakes, whether deceptive and 'dishonest' or merely uninformed and 'honest' ... [thereby concluding that] the statute allows correction in ... those nonjoinder cases where the unnamed inventor is free of deceptive intent." Id. at 1555.  It is well settled that a person's state of mind is a question of fact.  See Am. Acad. of Religion v. Napolitano, 573 F.3d 115, 133 n.17 (2d Cir.

13

2009) (citation omitted).

On the motion for preliminary injunction, this court concluded that Plaintiffs could not avoid a likelihood of success on the merits of M & I's infringement claim based on Miller's correction of inventorship claim because Plaintiffs failed to meet their burden of proof to show a substantial question of invalidity regarding same.  Specifically, the court found that a significant question existed regarding whether Miller's intent in refusing to be named as an inventor on the '353 patent was deceptive or dishonest.  Plaintiffs now argue that summary judgment is inappropriate on this issue because the factual question regarding Miller's intent remains for a jury to decide.  Airtex counters that Plaintiffs failed to establish a legally sufficient evidentiary basis for a jury to find in their favor on the issue of correction of named inventors, and since Plaintiffs fail to submit any additional evidence, Airtex is entitled to summary judgment on this issue.  Airtex further submits additional evidence which supports its position.

When deciding the motion for a preliminary injunction, this court noted the following as part of the factual background of the '353 patent application, including Miller's response to Yazici's suggestion that Miller be named as an inventor therein:

> In an electronic message sent April 3, 2002 Miller told Yazici, 'I don't think we have much to talk about until we get the order for the D[ ]iven job.  The patent application does a good job of describing your induction units, but other than showing them in a square configuration it does not have anything to do with my design and you don't need to have my name on that application.' [Decl. of James Miller, June 23, 2008, Ex. 6, Dkt. No. 26.; Decl. of Gerhard Granek, April 25, 2008, Ex. B, Dkt. No. 13].  Miller explains that he 'did not believe [M & I's] patent application described [his]

14

> invention or that the design therein functioned in an
> efficient manner.' Miller Decl. ¶ 13. Significantly,
> Miller admits he did not show his April 3, 2002
> electronic message to his patent attorney 'to investigate
> what effect it would have on [his] pending patent
> application.' Id.

NuClimate Air Quality Systems, Inc., 2008 WL 2917589, at *3. In finding that a "significant question" existed regarding Miller's intent in refusing to be named as an inventor on the '353 patent application, this court considered Miller's assertion that he believed the four induction unit system was his invention, not M & I's. Therefore, it was questionable whether Miller's referenced assertions to Yazici were deceptive or dishonest. However, Miller has since testified that when prosecuting his own patent application for his design,[4] he never told the PTO that his invention "was just the connection of four inductor units in a square or rectangular configuration[.]" See Dep. of James H. Miller, Oct. 28, 2008, 168:18-22, Dkt. No. 45-19. Further, Miller also testified that, contrary to his former assertions, he did in fact inform his attorney of the '353 patent application and of his refusal to be named as an inventor. See id., 41:6-16.

Considering the foregoing evidence, no reasonable jury could find that Miller was being dishonest or deceptive when he refused to be named as an inventor on the '353 patent application. Accordingly, Airtex is entitled to an order that Miller is not an inventor of the design embodied in the '353 patent.

### c. Priority of Invention

By statute, "priority of invention goes to the first party to reduce an

---

[4] Miller and co-inventor, William Shultes filed a patent application on April 25, 2002, which eventually matured into U.S. Patent No. 6,569,010, issued on May 27, 2003 ("the '010 patent").

invention to practice unless the other party can show that it was the first to conceive of the invention and that it exercised reasonable diligence in later reducing that invention to practice." Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1169 (Fed. Cir. 2006) (quoting Cooper v. Goldfarb, 154 F.3d 1321, 1327 (Fed. Cir. 1998)).  "Priority, conception, and reduction to practice are questions of law which are based on subsidiary factual findings." Henkel Corp. v. Procter & Gamble Co., 485 F.3d 1370, 1374 (Fed. Cir. 2007) (quoting Cooper v. Goldfarb, 154 F.3d 1321, 1327 (Fed. Cir. 1998)).

A district court has jurisdiction over an interference proceeding, which is brought through a civil action by the owner of an interfering patent.  "The owner of an interfering patent may have relief against the owner of another by civil action, and the court may adjudge the question of the validity of any of the interfering patents, in whole or in part." 35 U.S.C. § 291.  An interference proceeding "is a proceeding ... to determine any question of patentability and priority of invention between two or more parties claiming the same patentable invention." Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1365 (Fed. Cir. 2004) (quoting 37 C.F.R. § 1.601(i)).  In order to succeed in such a proceeding, even where, as here, it is conducted in a district court pursuant to § 291, "a party that does not have the earliest effective filing date needs only to demonstrate by a preponderance of the evidence that it was the first to invent if the two patents or applications at issue were co-pending before the PTO." Eli Lilly & Co., 376 F.3d at 1365 (citing Slip Track Sys., Inc. v. Metal-Lite, Inc., 304 F.3d 1256, 1262 (Fed. Cir. 2002)).  Moreover, it is important to note that because the general presumption of patent validity does not apply before a patent issues, when, as here, "the applications were co-pending, the timing of the interference proceeding is immaterial: the presumption of validity is nonexistent and the preponderance of

16

the evidence burden is appropriate even if both of the patents have issued by the time a § 291 interference proceeding is initiated in a district court." Eli Lilly & Co., 376 F.3d at 1365.  Accordingly, because the '353 patent issued from an application that had a later effective filing date than the '010 patent, but the applications were co-pending, Airtex bears the burden of establishing priority by a preponderance of the evidence instead of clear and convincing evidence.  See Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1169 (Fed. Cir. 2006) (citing Eli Lilly & Co., 376 F.3d at 1365.

On the motion for preliminary injunction, this court concluded that Plaintiffs could not avoid a likelihood of success on the merits of M & I's infringement claim based on their priority of invention challenge.  Specifically, the court found that significant factual questions remain regarding reduction to practice as well as conception.  Plaintiffs now argue that Airtex's motion for summary judgment in this regard should be denied on this basis as it has the burden of proof regarding priority of invention.

In their papers and at oral argument, the parties disputed whether a July 2001 demonstration represented Miller's reduction to practice or M & I's.  Plaintiffs relied on a February 23, 2001 facsimile, with attached diagrams of the test room and "quad model" to be demonstrated at M & I's facilities in July, which allegedly were Miller's design, and were drafted by Miller.  However, at his October, 2008 deposition, Miller admitted that those diagrams were not drafted by him and could have been drafted by Mr. Granek, one of the named inventors on the '353 patent.  See Miller Dep., 194:3-195:3; Dkt. Nos. 45-19, 45-21.  In view of this evidence, there is no question of fact regarding reduction to practice, and no reasonable juror could conclude that the July 2001 demonstration was Miller's reduction to practice.  Moreover, in light of Miller's deposition testimony, he

17

cannot show that he "was the first to conceive of the invention and that [he] exercised reasonable diligence in later reducing that invention to practice." Medichem, 437 F.3d at 1169.[5]  Consequently, Airtex is also entitled to summary judgment on the issue of priority of invention.

Accordingly, Airtex's motion for partial summary judgment is granted in its entirety.  Plaintiffs' motion for partial summary judgment regarding the Q-360 remains to be addressed.

### *C.  Plaintiffs' Motion for Partial Summary Judgment*

Plaintiffs seek an order that the Q-360 does not infringe claims 15, 18, 19 and 20 of the '353 patent, either literally or by its equivalent.  As previously discussed, literal infringement occurs when "each and every limitation set forth in a claim appear[s] in an accused product."  Cross Med. Prod., Inc., 424 F.3d at 1310.  Equivalent infringement occurs when one appropriates another's patented invention with a product that is "substantially the same thing, used in the same way, to achieve substantially the same result" as is described in a patent claim, which is known as the "doctrine of equivalents."  Wolf v. Fisher-Price Toys, Div. of Quaker Oats Co., No. 90-Civ.-0925(PKL), 1992 WL 51498, at *8 (S.D.N.Y. Mar. 9, 1992) (quoting SRI Int'l v. Matsushita Elec. Corp. of America, 775 F.2d 1107, 1124 (Fed. Cir. 1985) (en banc)).

The doctrine of equivalents applies (1) when the equivalent represents an insubstantial change from the claim language; or (2) if it performs substantially the

---

[5] To be sure, Plaintiffs assert in their Statement of Additional Material Facts, which Airtex failed to controvert, that "Miller and [co-inventor William] Shultes finalized a design, had a prototype made at a local sheet metal shop and tested the design."  Pls.' Statement of Additional Material Facts, ¶ 7, Dkt. No. 44.  In support of this statement of fact, however, Plaintiffs cite only the declaration of Shultes, who is Miller's co-inventor.  Because Shultes is the admitted co-inventor of Miller, a finder of fact may not rely on his testimony to find a reduction to practice.  See Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1169-71 (Fed. Cir. 2006).

same function in substantially the same way to obtain the same result.  See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 493 F.3d 1368, 1377 (Fed. Cir. 2007).  The doctrine of equivalents is applied to individual elements of a claim, not to the invention as a whole, and application to an individual element should not be so broad as to effectively eliminate that element.  See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 469 F.3d 1005, 1017 (Fed. Cir. 2006). This is referred to as the "all elements rule."  Id.  The all elements rule does not necessarily require a "one-to-one correspondence" between components of a device and the invention; instead, equivalency may exist when separate claim limitations are combined into a single component of the alleged infringing device, and the differences are insubstantial.  Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc., 305 F.3d 1303, 1317 (Fed. Cir. 2002).

If equivalence appears, infringement will be found unless (1) arguments or amendments made by the applicant during prosecution estop the patentee from asserting a range of equivalence broad enough to encompass the accused product (otherwise known as prosecution history estoppel), see Texas Instruments Inc. v. U.S. International Trade Commission, 988 F.2d 1165, 1173 (Fed. Cir.1993), or (2) the equivalent device is within the public domain, i.e., is found in the prior art, see Hyperphrase Technologies, LLC v. Google, Inc., Nos. 2007-1125, 2007-1176, 260 Fed.App'x 274, 282 (Fed. Cir. 2007).  As the alleged infringers, Plaintiffs bear the burden of establishing that the alleged equivalent device is in the prior art. See RF Delaware, Inc. v. Pacific Keystone Techs., Inc., 326 F.3d at 1255, 1267 (Fed. Cir. 2003).

A determination of patent infringement requires the same two-step process previously discussed, whether literal or equivalent infringement is alleged. "[F]irst, the meaning of the claim language is construed, then the facts are applied

to determine if the accused device falls within the scope of the claims as interpreted." MBO Labs., Inc., 474 F.3d at 1329. It is important to note that "the failure to meet a single limitation is sufficient to negate infringement of a claim." Nomos Corp. v. Brainlab USA, Inc., 357 F.3d 1364, 1365 n.1 (Fed. Cir. 2004) (quoting Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1535 (Fed. Cir. 1991)). Again, construction of the meaning of claim language is a question of law for the court to decide. See NTP, Inc., 418 F.3d at 1305 n.8.

To begin with, the court further notes that "[i]nfringement, either literally or under the doctrine of equivalents, does not arise by comparing the accused product with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee." Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc., 285 F.3d 1046, 1052 (Fed. Cir. 2002) (quotation and citation omitted). Accordingly, the court will disregard any argument by either of the parties that relies upon a comparison of the Q-360 to a preferred or commercial embodiment of the '353 patent instead of the claims themselves.[6] This is not to say that when interpreting the claim language, the court should not rely on language in the specification which describes a preferred embodiment, although such language should not be given greater weight than the summary of the invention. See PSN Illinois, LLC v. Ivoclar Vivadent, Inc., 525 F.3d 1159, 1166 (Fed. Cir. 2008). The Court of Appeals for the Federal Circuit has clarified that "[c]onstruing the claims in light of the specification does not, however, imply that limitations discussed in the specification may be read into the claims. It is

---

[6] In this regard, Airtex's motion to supplement its memorandum in opposition to Plaintiffs' motion for summary judgment, see Dkt. No. 80, is denied, as the sole basis of the motion is to submit additional evidence that supports a comparison of the Q-360 to the Q-4 instead of the claims of the '353 patent.

therefore important not to confuse exemplars or preferred embodiments in the specification that serve to teach and enable the invention with limitations that define the outer boundaries of claim scope." Intervet Inc. v. Merial Ltd., 617 F.3d 1282, 1287 (Fed. Cir. 2010) (citing Phillips, 415 F.3d at 1323). "A construing court's reliance on the specification must not go so far as to import limitations into claims from examples or embodiments appearing only in a patent's written description ... unless the specification makes clear that the patentee ... intends for the claims and the embodiments in the specification to be strictly coextensive." Silicon Graphics, Inc. v. ATI Techs., Inc., 607 F.3d 784, 792 (Fed. Cir. 2010) (citing JVW Enters., Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1335 (Fed. Cir. 2005)) (quoting Phillips, 415 F.3d at 1323))).

The Court of Appeals for the Federal Circuit has counseled that

> [o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.

Phillips, 415 F.3d at 1314. Also, it is important to note that under the doctrine of claim differentiation, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325, 1342 (Fed. Cir. 2010) (quoting Phillips, 415 F.3d at 1315). The doctrine of claim differentiation, however, is not a conclusive basis for construing claims, and may be overcome where the patent specification or the prosecution history would

allow.  See Bradford Co. v. Conteyor North Am., Inc., 603 F.3d 1262, 1271 (Fed. Cir. 2010).

On the motion for a preliminary injunction, this court held that M & I failed to show a likelihood of success on its claim that the Q-360 equivalently infringes claims 15 and 18 of the '353 patent.  Specifically, the court found that both claims require four induction units, but the Q-360 has only one.  The court further found that although the Q-360 and the '353 patented invention would arguably perform the same basic function, which is to combine primary and room air, which, once heated or cooled, is disbursed into an enclosed space, the process by which said function is performed is entirely different, the Q-360 utilizing a single primary air intake section, a single air mixing section, and a single air mixing chamber as opposed to the four primary air intake sections, four air mixing sections, and four air mixing chambers required by claims 15 and 18 of the '353 patent.

Plaintiffs urge this court to abide by its earlier findings and grant their motion for summary judgment, issuing an order that claims 15, 18, 19 and 20 do not infringe the '353 patent.  Airtex opposes, arguing that those claims do infringe the '353 patent, both literally and under the doctrine of equivalents.  Airtex notes that the disputed terms appear in both claim 15 and claim 18, and therefore they only address the terms in claim 15[7].  For the sake of convenience, as previously noted, claim 15 of the '353 patent discloses the following :

An air handling system for a building having a ceiling and an

_____

[7]  A finding of noninfringement as to independent claim 15 will likewise apply to independent claim 18, as the terms in dispute are identical to each of those claims.  Moreover, such a finding of noninfringement would apply to the dependent claims as well.  See Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1329 n. 5 (Fed. Cir. 2008) ("A conclusion of noninfringement as to the independent claims requires a conclusion of noninfringement as to the dependent claims.").

enclosed space below said ceiling, said system comprising:

> four induction units adapted for mounting adjacent said ceiling and forming four sides of an induction unit assembly which is substantially rectangular in plan view, each of said units having a primary air intake section and an air mixing section that, during use of said system and when viewed in transverse, vertical cross-section extends downwardly at an angle of approximately 90 degrees to said ceiling to an air outlet formed at a lower end of the air mixing section, each air mixing section also having a side air inlet for permitting return air to flow through a side thereof into an air mixing chamber of the induction unit; and

> supporting members for mounting the rectangular induction unit assembly so that said assembly is located adjacent said ceiling during use of the system in the building, wherein during use of the system, said return air is drawn by a venturi effect into each air mixing chamber and said induction units are capable of delivering a mixture of primary air, taken from the primary air intake sections, and return air through the air outlets to said enclosed space.

See supra, at 8-9.

Airtex disputes the meaning of the terms "induction unit assembly," "primary air intake section," "air mixing section" and "air mixing chamber." To begin with, though, Airtex argues that the term "comprising" in the first clause of claim 15 is significant as it relates to the indefinite articles "a" and "an," which appear in the second clause along with all of the disputed terms. The term "comprising," which appears in the '353 patent, is much broader than the term, "consisting," which does not appear in the patent, although Plaintiffs erroneously use that term in their motion papers to refer to the '353 patent language.

23

"'[C]omprising' . . .  is inclusive or open-ended and does not exclude additional, unrecited elements . . . [whereas] 'consisting of' excludes any element[,] step or[] ingredient not specified in the claim." Georgia-Pacific Corp. v. U.S. Gypsum Co., 195 F.3d 1322, 1327 (Fed. Cir. 1999) (citations omitted).  Accordingly, where an indefinite article "a" or "an" appears in a clause containing the open-ended transitional term "comprising," the rule is that "a" or "an" can mean "one or more." Baldwin Graphic Sys., Inc. v. Siebert, Inc., 512 F.3d 1338, 1342 (Fed. Cir. 2008).  An exception to this rule "only arises where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule." Id., at 1343.  Plaintiffs do not suggest that the exception applies here, but simply note that the term "comprising" means that the drafter of the patent claims "at least what follows and potentially more" and therefore requires that the claim may contain additional elements but must contain at least those elements claimed.  See Vehicular Techs. Corp. v. Titan Wheel Int'l, 212 F.3d 1377, 1382 (Fed. Cir. 2000).

Thus, Airtex argues, claim 15 is not limited to a structure having only one primary air intake section per unit, which is important because Airtex goes on to contend that the "primary air intake section" element reads literally on a nozzle, of which there are many in the Q-360.  Airtex further argues that claim 15 includes a structure where the four units are so interconnected as to form one induction unit assembly and that the Q-360 is an induction unit assembly.  Airtex also argues that the Q360 has four mixing chambers, that each side of the Q360 assembly is a mixing section, and that the term "induction unit" does not require a separate piece, but rather a portion of a four-sided induction unit assembly that performs the function of providing a mixture of primary air and return air out the bottom of a side of the four sided induction unit assembly.

24

Before embarking on construction of the disputed language, it is important to reiterate that the "failure to meet a single limitation is sufficient to negate infringement of a claim." Nomos, 357 F.3d at 1365 n.1.  Accordingly, in order to avoid summary judgment here, Airtex has the heavy burden to identify an evidentiary conflict created on the record as to each infringement for each limitation.  See TechSearch, LLC v. Intel Corp., 286 F.3d 1360, 1372 (Fed. Cir. 2002).  Conclusory statements of experts will not raise a genuine issue of material fact precluding summary judgment.  Id. (citing Phillips Petroleum Co. v. Huntsman Polymers Corp., 157 F.3d 866, 876 (Fed. Cir. 1998)).

Also, the court is again mindful that when construing claim language, extrinsic evidence  "can be of limited value to claim construction, 'considered in the context of the intrinsic evidence,' if it 'can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean.'" Howmedica Osteonics Corp. v. Wright Medical Tech., Inc., 540 F.3d 1337, 1346 (Fed. Cir. 2008) (quoting Phillips, 415 F.3d at 1319).  However, "while extrinsic evidence can shed useful light on the relevant art ... it is less significant than the intrinsic record in determining the legally operative meaning of claim language." TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc., 529 F.3d 1364, 1372 (Fed. Cir. 2008) (quoting Phillips, 415 F.3d at 1317 (internal quotations and citations omitted)).

### 1. Primary Air Intake Section

Airtex argues that "primary air intake section" reads literally on a nozzle, of which there are many in the Q-360.  Plaintiffs counter that the "'primary air intake section' . . . is the plenum or the compartment into which the primary air is fed [,] . . . [and therefore, t]he nozzles of the Q-360 are not 'primary air intake sections.'"

25

Pls.' Mem. of Law in Support of Motion for Summ. J., 10-11, Dkt. No. 49.  Airtex contends that Plaintiffs cannot read the "plenum" limitation from dependent claim 16 into independent claim 15.  Airtex further argues that "[t]he language of claim 15 makes clear that the primary air intake section delivers primary air to the mixing chamber" which is exactly the function of each nozzle in the Q-360. Def.s' Mem. of Law at 13.  Moreover, Airtex notes, language in the summary of the invention makes clear that a plenum is the preferred but not required embodiment.  See id., at 10 ("In one preferred embodiment, each primary air intake section comprises an elongate, horizontally extending air plenum mounted at an upper end of the air mixing chamber and having a primary air inlet formed in one end thereof.") (quoting '353 patent, col.3 ll.47-50, Ex. A to Decl of Neal Slifkin, May 27, 2009, Dkt. No. 50).  Plaintiffs counter that "[t]he '353 patent consistently refers to the nozzles separately from . . . 'primary air intake sections'" Pls.' Mem. of Law at 11, but that is simply not true.  The court's search of the '353 patent language reveals that aside from claims 15, 16, and 18, the only reference to "primary air intake section" appears in the summary of the invention, in paragraphs entirely separate from those where "nozzles" occur, and in no way are those two terms ever referenced together.  See Ex. A to Slifkin Decl., col.3 ll.32, 45, 47-48, 61-62.  Moreover Airtex is correct that in this case, Plaintiffs cannot read the plenum limitation from dependent claim 16 into independent claim 15. While such a rule is not absolute, as Airtex seems to assert, here there is nothing in the specification which would overcome the presumption, under the doctrine of claim differentiation, that the plenum limitation in claim 16 is not present in independent claim 15.  In the specification, the only occurrence of the term "primary air intake section" as it relates to a plenum is in reference to one

26

preferred embodiment, and accordingly, cannot be read into claim 15.

Turning then to extrinsic evidence, Airtex cites testimony of Plaintiffs' expert, Michael I. Tatkow ("Tatkow"). See Ex. I to Slifkin Decl., Dkt. No. 50. Mr. Tatkow responded in the affirmative when asked whether a primary air intake section is a portion of a unit which has a single opening and allows primary air to pass through that opening. See id., 90:5-10. Mr. Tatkow also conceded that it is a reasonably inferred conclusion from the language of claim 15 of the '353 patent that the purpose of the primary air intake section is to deliver primary air to the mixing chamber. See id., 135:21-136:11. Finally, Mr. Tatkow testified that the function of a nozzle in the Q-360 or any induction system is to be a pathway for primary air into the mixing chamber. See id., 155:9-21.

In response, Plaintiffs cite a statement of Muammer Yazici, made at the time that he was president of M & I, the former owner of the '353 patent. Yazici, who claims that the Q-360 infringes the '353 patent, explains that "[e]ach of the four induction segments or four inductions sections of the 360 degree induction nozzle assembly will necessarily include a primary air intake section that directs primary air into the induction nozzles . . . ." Decl. of Muammer Yazici, May 14, 2008 ("Yazici Decl."), ¶ 41, at Ex. B to Decl. of Neal L. Slifkin, July 6, 2009, Dkt. No. 69. Plaintiffs also cite deposition testimony of Dipti Datta, a former president of M & I. Mr. Datta responded affirmatively when asked whether the primary air intake section on a model of the Q-360 directs primary air into the induction nozzles. See Dep. of Dipti Datta, June 12, 2009, 131:23-132:4, at Ex. C to Slifkin Decl., Dkt. No. 69 ("Datta Dep.").

Consequently, a question of fact exists as to whether, as Airtex argues, the "primary air intake section" element in claim 15 of the '353 patent reads literally

on a nozzle, of which there are many in the Q-360.

## 2.  Air Mixing Chamber and Air Mixing Section

Airtex next contends that the Q-360 has four air mixing sections forming four air mixing chambers as is described in claim 15 of the '353 patent.  Airtex bases its argument on the assertion that the term "mixing chamber" used in claim 15 is not an enclosed space bounded by four walls but instead is merely an outer wall and an inner wall and that the term "mixing section" in claim 15 is that portion of the assembly that forms a mixing chamber.

Airtex also argues that there is nothing in the '353 patent which would prevent "direct communication" between the chambers.  Tatkow testified that claim 15 does not limit the geometry of how the four induction units abut one another and therefore does not require that the four induction units be connected by piping.  Id., 93:11-94:8.  Tatkow also testified that there is nothing in claim 15 which would exclude the removal of the end walls of the individual units and interconnecting them in that manner.  Id., 93:101:10-19.  Airtex argues that the abstract language, which refers to an air handling system "including four interconnected induction units," fully supports its contention that direct communication between the induction units is consistent with claim 15, and further argues that nowhere in the specification is the manner of interconnection limited.  Airtex notes that claim 21, which depends from claim 18, recites that the induction units have end walls, and therefore, the term "unit," which means the same thing in claims 15 and 18, does not require end walls.  Moreover, Airtex notes, claim 15 does not require a particular number of walls.  Accordingly, Airtex argues, it follows that the Q-360 has four air mixing chambers and four air mixing sections.

28

To be sure, the common definition of a "chamber" is a natural or artificial enclosed space or cavity.  The term, enclosed, means to close in or surround. "[D]ictionaries and treatises can be useful in claim construction," particularly insofar as they help the court "to better understand the underlying technology and the way in which one of skill in the art might use the claim terms." <u>Paragon Solutions, LLC v. Timex Corp.</u>, 566 F.3d 1075, 1092 (Fed. Cir. 2009) (<u>quoting</u> <u>Phillips</u>, 415 F.3d at 1318).

Airtex argues, however, that the industry definition of a "chamber" is different than its common meaning.  In support of this argument, Airtex first cites NuClimate's non-provisional patent application on the Q-360 as well as testimony from Mr. Tatkow regarding the definition of "chamber" which appears therein. Airtex alleges that Mr. Miller admitted NuClimate represented to the PTO in their provisional patent application on the Q-360 "that all you need to form a mixing chamber is an outer wall and some type of inner wall."  Def.'s Mem. of Law, at 13, Dkt. No. 67, citing Dep. of John A. DeMillo, Mar. 4, 2009, 170:7-172:3, at Ex. D to Slifkin Decl., Dkt. No. 62; Ex. 3 to Yazici Decl., at bates no. BSK-000027.  The referenced page of the cited patent application represents NuClimate's recitation of the prior art.  In describing an unidentified induction unit, NuClimate states the mixing chamber of this particular unit is defined by its mixing chamber outer wall and its drainage base.  <u>See</u> Ex. 3 to Yazici Decl., at bates no. BSK-000027. DeMillo testified that while that is the definition of "chamber " that NuClimate gave the PTO, he does not agree with the definition.  <u>See</u> DeMillo Dep. 170:4-19. The remainder of DeMillo's cited testimony, however, deals with his response to questions regarding whether there are four mixing chambers in a diagram of a unit that is not representative of the Q-360.  <u>See</u> id., 170:20-172:9.  Significantly, as

Plaintiffs point out, Mr. Datta testified that the Q-360 operates as a single air mixing section.  See Datta Dep., 114:2-17.

Airtex further represents to this court that Mr. Tatkow testified that NuClimate's definition of "chamber" in their patent application is consistent with the industry definition.  See Def.'s Mem. of Law at 13, citing Tatkow Dep. 118:17-119:6.  In fact, Tatkow testified that it was "fairly consistent" and was referring to the following definition of "chamber" which appears in the definitions section of the cited patent application: "a chamber shall be considered a chamber even if it is not fully enclosed by solid walls and/or leaks some air, *so long as it effectively acts substantially like a chamber with respect to directing airflows*." Tatkow Dep., 119:6; Ex. 3 to Yazici Decl., at bates no. BSK-000039 (emphasis added).  So, as Tatkow testified, while a chamber may have one or more outlets, "[i]f you have no way to enclose it, you have no way to have separate chambers." Tatkow Dep., 131:12-20.  Stated another way, "[i]n order to complete the requirement of four induction units with separate chambers, the chambers have to have a functional level of enclosure prior to assembly."  Id., 100:15-18.

It is clear that the Q-360 has only four outer walls and four inner walls.  As such, there is only one functional level of enclosure, not four as is required by claim 15.  Airtex's argument that the Q-360 reads literally on a "mixing chamber" is belied by the intrinsic evidence.  According to the abstract, the '353 patent discloses a system which includes "four interconnected induction units" each of which unit "includes an air plenum section and an air mixing section connected to a side of the air plenum section and forming an elongate air mixing chamber."  Ex. A to Slifkin Decl.  The summary of the invention discloses that "[t]he induction units are capable of delivering *a mixture* of primary air, that passes though the

30

plenum sections and the nozzles, and return air through the outlets to the enclosed air space." Id., col.2 ll.60-63 (emphasis added). Airtex's argument that a chamber is merely two parallel walls with nothing else to confine the air to be mixed is inconsistent with the patent language. Accordingly, the Q-360 does not read literally on the "mixing chamber" or "mixing section" elements of claim 15. Nor is the Q-360 the equivalent of these elements. For the reasons discussed, the Q-360 clearly represents a substantial change from the claim language. Moreover, the Q-360 does not perform the same function in substantially the same way as the patented invention. Consequently, because a finding of non-infringement is warranted on this basis alone, see supra, at 20, Plaintiff's motion for partial summary judgment is granted, and the remainder of Airtex's arguments need not be addressed.

### III.  Conclusion

In accordance with the foregoing, it is hereby ORDERED that the motion for summary judgment by defendant and counter-plaintiff, Airtex Manufacturing Partnership against plaintiffs and counter-defendants, NuClimate Air Quality Systems, Inc. and James Miller, see Dkt. No. 34, seeking an order that the Q-4 air terminal infringes claims 1, 2, 5, 8, 10, 15 and 17 of U.S. Patent No. 6,623,353, that said patent is valid and enforceable, and that plaintiff/counter defendant James Miller is not an inventor of said patent is GRANTED in its entirety; and it is further

ORDERED that Plaintiffs are hereby permanently enjoined from the further manufacture, use, sale, and/or offer for sale of its model Q-4 air terminal; and it is further

ORDERED that the motion for summary judgment by plaintiffs and

counter-defendants, NuClimate Air Quality Systems, Inc. and James Miller against defendant and counter-plaintiff, Airtex Manufacturing Partnership, <u>see</u> Dkt. No. 47, seeking an order that the Q-360 air terminal does not infringe claims 15, 18, 19 and 20 of U.S. Patent No. 6,623,353 is GRANTED in its entirety; and it is further

ORDERED that the motion by Airtex Manufacturing Partnership for leave to file supplemental papers in opposition to the motion for summary judgment by plaintiffs and counter-defendants, NuClimate Air Quality Systems, Inc. and James Miller, <u>see</u> Dkt. No. 80, is DENIED.

Remaining for resolution at trial is the issue of Airtex's claim for damages on their counterclaim against Plaintiffs.

IT IS SO ORDERED.

DATED:      January 10, 2011
            Syracuse, New York

_____
Neal P. McCurn
Senior  U.S. District Judge